CARLIE CHRISTENSEN, Acting United States Attorney (# 0633)
RICHARD D. McKELVIE, Assistant United States Attorney (#2205)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah  84111
Telephone:  (801) 524-5682

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:09-cr-045 TS |
| Plaintiff, | : | |
| vs. | : | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS |
| DAVID A. LACY, | : | |
| Defendant. | : | Hon. Ted Stewart |

The United States, by and through the undersigned Assistant United States Attorney, hereby files the following memorandum in opposition to Defendant's motion to suppress his statements to federal law enforcement officers on June 10, 2009.  As set forth below, Defendant's motion should be denied because his custodial interrogation was preceded by a proper *Miranda* warning, he waived those rights, and his subsequent statements were voluntary.

**STATEMENT OF FACTS**[1]

On June 10, 2009, as part of a larger coordinated law enforcement operation, federal law enforcement officers from the Federal Bureau of Investigation (FBI) and the Bureau of Land Management (BLM) went to the Blanding, Utah residence of David A.

---

[1]All factual references refer to the transcript of hearing, February 23, 2010, and will be referenced by transcript page number, i.e. T. 1.

Lacy (Defendant) for the purpose of executing search and arrest warrants. (T. 17-22). Approximately 10-12 law enforcement and other personnel, including at least one BLM archeologist and two civilian FBI evidence recovery technicians participated in the operation. (T. 16, 31-32, 56.) The officers had a federally-issued search warrant for Defendant's residence, and an arrest warrant for Defendant.

     Two BLM Rangers, National Chief Ranger Jason Caffey and Ranger Scott Kotlowski, were part of the search team, and specifically assigned to interview Defendant. (T. 16-17, 66). Neither Ranger Caffey nor Ranger Kotlowski had been participants in the investigation which led to the issuance of the arrest and search warrants, nor did Rangers Caffey and Kotlowski work directly with one another as part of their regular assignments.[2] Although both Rangers Caffey and Kotlowski were at the Lacy residence at the time law enforcement officers initially entered the residence, neither was actively involved in initially contacting the residents of the home. Both rangers, however, were in a location from where they were able to determine that entry into the residence was made only after Defendant was contacted and opened the door at the rear of the house. (T. 21-22). Both rangers were armed with their service handguns. In addition, Ranger Kotlowski was armed with a shotgun, which he secured in his vehicle before he made contact with the defendant. (T. 69, 71.) Both rangers were dressed in clothing which clearly identified them as BLM law enforcement rangers. (T. 19-21, 68-69).

---

[2]Chief Ranger Caffey is stationed in Boise, Idaho, while Ranger Kotlowski is stationed in Palm Springs, California. (T. 12, 17, 59)

After the initial entry, Ranger Caffey greeted Defendant outside the residence, introduced himself, and indicated that the agents had a warrant to search the premises. (T. 24). Defendant immediately responded that "his brother was the sheriff and everything was okay." (Id.) Ranger Caffey advised Defendant that the warrant was for archeological crimes, and Defendant responded by saying, "I'll show you anything you want to see and I'll tell you anything you want to know." Ranger Caffey testified that Defendant was "very cooperative." (T. 25, 74).

Defendant took the rangers to a room in the residence where he had stored "pots" against the wall, on the floor and in boxes. (T. 27, 74). During that time, neither ranger asked Defendant any substantive questions, nor did they engage in any conversation with Defendant relating to their investigation. They asked Defendant if there was someplace private where they could talk, and Defendant took them to an unfinished bedroom near the room where he stored the pots. (Id.) The rangers and Defendant sat down in three chairs that were in the room or brought to the room for the purpose of the interview. (T. 28, 76).

At the beginning of the interview, Ranger Kotlowski advised Defendant of his *Miranda* rights. He read them from a card which he obtained from the federal law enforcement training center. (T. 76, Government's Exhibit 1). Ranger Kotlowski testified at the suppression hearing that he read the card *verbatim*:

BY MS. CHRISTENSEN:

Q   In looking at this document, Ranger Kotlowski, it looks to me like there are several paragraphs or several sections on the card. Can you identify specifically what information from that card you conveyed to Mr. Lacy?

A   The warning section and the waiver section.

MS. CHRISTENSEN: Your Honor, if you don't mind, I'm going to ask him to read that into the record.

THE COURT: That's fine.

THE WITNESS: Under the warning section, you have the right to remain silent. Anything you say can be used against you in court. You have the right to consult with an attorney and to have them present during questioning. If you cannot afford an attorney, one will be appointed to represent you prior to questioning.

(T. At 77).

After reading the warnings from the card, Ranger Kotlowski asked Defendant "if you understand your rights and are you willing to waive these rights and talk." (T. 78). Defendant responded that he would like to talk to the agents. (Id.) He did not ask any questions about the rights he had been read, nor did he ask to speak with an attorney. He did not express any hesitancy or concern about answering questions. (T. 78, 51, 28-29). Again, Ranger Caffey testified that Defendant "said he would tell us anything we wanted to know. He was very cooperative." (T. 29).

Rangers Caffey and Kotlowski interviewed Defendant for a period ranging from two to three hours (T. 30, 81)[3] At some time during the course of the interview, Ranger Kotlowski excused himself to obtain a "consent to search" form in order to obtain permission to search Defendant's truck. (T. 31, 72, Government's Exhibit 2). Defendant signed the consent form at 8:08 a.m. (T. 81, Exhibit 2).

At the conclusion of the interview, Defendant was informed that a warrant for his arrest would be executed. Ranger Caffey testified that he didn't notify Defendant about the warrant until that time for safety reasons:

---

[3] Defendant testified that the interview took three to four hours. (T. 114).

> Q   Can you tell the Court why you made that decision?
>
> A   As a matter of practice, I would never -- maybe not never, but I very rarely would tell someone we're going to arrest them until it's time to arrest them and put handcuffs on them.
>
> Q   Why is that?
>
> A   In most cases, it would be a safety thing. I want to be -- when they know they are going to jail, if there's going to be a safety consideration, that's when it's going to be. If they are going to try to fight or become aggressive, it's going to be when they know they are going to jail. I want that to be under my terms. I don't want to have somebody know they are going to go to jail and sit and stew and think about it for minutes or hours before I actually secure them.

(T. 57)

At that time, the rangers also asked Defendant to sign a written acknowledgment and waiver of his *Miranda* rights, which he did. (T. 32-33, Government's Exhibit 3). Although the waiver was signed by Defendant, it was not signed by the rangers, nor was the time noted on the document. (T. 56).

At the hearing on the motion to suppress, Defendant testified that on the morning of June 10, 2009, he awakened early in the morning and had fallen back to sleep while watching TV, when he heard banging on the outside door around 6:30-6:45 a.m. (T. 103-104). He testified that he believed his son, who is a deputy sheriff, was the source of the noise. He observed several agents, with guns drawn, approach him and indicate they were executing a search warrant. (T. 105). They asked him if he had weapons in the house and he responded that he did. (Id.)

Defendant was informed that the search warrant was for "artifacts" and he "told them [he] could take them right to the artifacts." (T. 106). On cross-examination, Defendant acknowledged that he was anxious to assist the rangers in identifying artifacts

in his home, because "it would be easier if I showed them than having them tear up my house looking for them" and because he believed he could convince the rangers that he possessed the artifacts legally. (T. 123). He also acknowledged that, at that time, the rangers did not ask him any questions about the artifacts or their origin. (T. 124).

Defendant acknowledged that he is "very familiar" with *Miranda* rights because he has been around law enforcement all his life, and because he has "seen it on TV." He testified that his father was formerly the San Juan County Sheriff and a highway patrol trooper, his brother is currently the San Juan County Sheriff, and his son is a Deputy Sheriff. (T. 121).

Defendant denied that Ranger Kotlowski read the *Miranda* warnings to him at the outset of the interview. However, Defendant did acknowledge that at the outset of the conversation, the rangers brought up the issue of a lawyer. The topic of a lawyer was first raised by the rangers, and not in response to any inquiry made by Defendant. (T. 126).

On redirect examination, Defendant testified that he did not know that he had the right to terminate the interview or the right to remain silent. (T. 135). That testimony, however, was in direct contradiction to his previous testimony that he was "very familiar" with *Miranda* rights. (T. 126, 112).

During the course of his testimony, Defendant acknowledged that the entire conversation between he and the rangers was voluntary. (T. 126). He also testified that he was never denied any breaks (although he asked for none) and that he never made any requests or attempts to terminate the interview. (Id.). He testified that he was very comfortable around law enforcement officers in general (T. 120-21), that there was nothing unusual about the weapons or uniforms worn by the agents on June 10 (T. 121),

and that neither Ranger Caffey nor Kotlowski ever had their weapons unholstered or used them in a threatening manner. (Id.).

He also testified that, in the moments leading up to the interview, he had recently awakened, was surprised by the presence of the agents, felt a degree of apprehension, and that there were a lot of things going through his head at once. (T. 134).

## ARGUMENT

### 1. DEFENDANT'S *MIRANDA* RIGHTS WERE NOT VIOLATED

As set forth below, Defendant's motion to suppress his statements to federal law enforcement officers should be denied because Defendant's custodial interrogation was preceded by a proper *Miranda* warning and Defendant subsequently waived those rights.

A. Defendant was subjected to a custodial interrogation.

In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court held that prior to custodial questioning, an individual must be "clearly informed," that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either appointed or retained. 384 U.S. at 444. Although subsequent cases from both the Supreme Court and virtually all Courts of Appeal have further defined and reviewed the concept of "custodial questioning," the United States is not asking this Court to undertake that analysis here.

In this case, Defendant was questioned in his own home, was neither handcuffed nor physically restrained in any way, and was not informed that he was under arrest.[4] The record is clear, however, that the BLM rangers intended to execute an arrest warrant for

---

[4]These facts, however, are all relevant to the separate issue of voluntariness.

Defendant, and that Defendant was purposefully questioned in an effort to elicit incriminating responses. Therefore, for purposes of this proceeding, the United States acknowledges that Defendant was subject to a custodial interrogation.

      B.  <u>The custodial interrogation was preceded by a proper *Miranda* warning and subsequent waivers.</u>

      In *Miranda v. Arizona*, reaffirmed in *Dickerson v. United States,* 530 U.S. 428, 120 (2000), the Supreme Court further held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from the custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. These procedural safeguards require that prior to any custodial questioning, the person must be warned that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. Some effective version of these warnings must be given in advance of any custodial interrogation, regardless of whether the statements made are otherwise voluntary, or the defendant is independently familiar with his rights.

      "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-474. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id. at 475.

In *Florida v. Powell*, –S.Ct.—, 2010 WL 605603 (2010), the Supreme Court determined that *Miranda* was satisfied by a warning on a written form as follows: "You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview." The Court rejected defendant's argument that the warning was insufficient because he was not specifically advised that he could have a lawyer present during questioning.

In this case, the warnings given by Ranger Kotlowski and witnessed by Chief Ranger Caffey were sufficient under *Miranda* and more thorough than those given in *Powell*, because the Defendant was specifically advised that his right to counsel included the right to have counsel present during questioning. (T. 77).

Defendant, however, has testified that, contrary to the testimony of Rangers Caffey and Kotlowski, the *Miranda* warnings were not given to him in advance of questioning. (T. 112). The issue, then, becomes one of a determination of credibility.

In assessing the credibility of the witnesses, the Court should consider the consistency in the testimony of Rangers Kotlowski and Caffey, the motive, if any, to give false testimony, and the circumstances surrounding the search and interrogation.

Rangers Caffey and Kotlowski both testified that the *Miranda* warnings were given by Ranger Kotlowski in the unfinished bedroom, in advance of the interrogation. Ranger Kotlowski was very specific, indicating that he read the rights from the card

provided him at the federal law enforcement training center. (T. 76). Ranger Caffey likewise testified that Ranger Kotlowski "read his Miranda rights from a card." (T. 28).

Both rangers recalled that Defendant was very cooperative, and would "tell us anything we wanted to know." (T. 29, 78 ). Both rangers recalled the approximate length of the interrogation, the fact that Ranger Kotlowski excused himself to obtain a consent to search form, and the general nature of the conversation.

Notably, neither Ranger Caffey nor Ranger Kotlowski were involved in the investigation that led to the search and arrest warrants, and neither was aware of the investigation until days before the interrogation took place. (T. 13-16, 62-63). Neither knew of their specific assignment until the day before the arrests occurred (T. 63-66, 14-17). They completed a joint report of investigation on the same day as the events occurred (T. 48, 98).

Neither Ranger Kotlowski nor Ranger Caffey had any motive to testify untruthfully. They were a small part of a larger operation, and were only peripherally involved. Although they were assigned to interrogate Defendant, the basis of their questioning came from information given to them by other investigators rather than from their own knowledge of the investigation. Certainly, they had no motive to "trick" Defendant into giving a statement in violation of his constitutional rights, and then create a coordinated and rather elaborate series of lies to conceal their violation. Based upon this record, there is no evidence upon which to conclude that Rangers Caffey and Kotlowski had a motive to lie.

The Defendant, on the other hand, has much at stake in the outcome of this hearing and, by extension, this case. In his testimony, he acknowledged that he was very

concerned about losing his job as a teacher. (T. 116) As the son, father and brother of law enforcement officers in his small county (T. 120) he is certainly familiar with the stigma, as well as the panoply of restrictions, that he faces if convicted of a felony, including the potential loss of his job and possible incarceration. Whereas there is no independent basis upon which to conclude that the rangers had any motive to lie, the motive of the Defendant is readily apparent.

Most compelling, perhaps, in the determination of credibility is an analysis of the circumstances surrounding the events of June 10, 2009 and the testimony of the principal witnesses. Rangers Kotlowski and Caffey both testified that, at the conclusion of the interview, they presented Defendant with a written recitation of his *Miranda* rights, which he signed at their request. Although a subsequent recitation of rights will obviously not cure a prior violation, the facts surrounding the signed form certainly bear on credibility.

If, as Defendant must assert, Rangers Caffey and Kotlowski lied about the recitation of rights, why wouldn't they tell the "big lie," so to speak? Armed with a signed copy of the *Miranda* warning and a coordinated decision to commit perjury, it would be reasonable to assume that the rangers would simply complete the form by signing their names and adding a time to the form consistent with their intended testimony, and testify that Defendant signed the form contemporaneously to his waiver of rights.

Defendant's testimony, on the other hand, is inconsistent in many particulars. Although he acknowledges throughout his testimony that he is very aware of his *Miranda* rights and was aware of them on the date of his arrest (T. 112, 125), he also testified that he did not know he had a right to remain silent or to terminate the interview. (T. 135).

He also acknowledged in his testimony that there was a discussion of his right to have an attorney, and that subject was first raised by the rangers (T. 126, 112).  He then testified, however, that he did not know a lawyer would be appointed for him if he could not afford one.  (T. 135).

Defendant also acknowledged the surprise, confusion and anxiety that he felt on the morning of his arrest.  It is certainly feasible that the warnings were given to him exactly as Rangers Caffey and Kotlowski testified, but that his memory of the events of that day is unclear because of the surprise, confusion and anxiety he was feeling.  That fact, of course, would not negate the validity of the warnings and waivers, unless the Court determined as a result that the statements were made involuntarily.

## 2.  DEFENDANT'S STATEMENTS WERE VOLUNTARY

Assuming the Court finds that defendant's *Miranda* rights were honored, the court must still determine whether the statements were voluntary.  18 U.S.C. § 3501, *Chavez v. Martinez,* 538 U.S. 760 (2003).  To determine whether a defendant's statements were voluntary, the court must determine whether, in light of the totality of the circumstances, the will of the accused was overborne.  *Mincy v. Arizona*, 437 U.S. 385, 399-401 (1978).

In making that determination, the court should consider the location of questioning, whether *Miranda* warnings were given, whether the contact was initiated by the accused or the officers, the accused's characteristics (such as youth, drug addiction, physical condition) and experience with the criminal justice system.

In this case, the interview took place in Defendant's home, an environment in which he is clearly comfortable.  He was given the appropriate warnings, as discussed above.  He is very comfortable around law enforcement officers, having been around

them all of his life. There is nothing in the record to indicate that his age, physical condition, or any substance abuse problem affected his decision to talk to the rangers in any way.

Notably, even as Defendant complained that the rangers did not give the *Miranda* warnings to him, he testified that his statements were voluntary. (T. 126) That testimony was consistent with that of Rangers Caffey and Kowalski, who both testified that Defendant was cooperative and in fact appeared anxious to speak with them. The totality of the circumstances indicate that Defendant's statements were voluntarily made.

It should be noted that Defendant's children testified that they learned that their father's house was being searched, and their attempts to communicate with him were denied by searching agents. (T. 137-146) Given that the United States acknowledges that Defendant was in custody at the time of the interrogation, their testimony adds nothing to the equation. *See Moran v. Turbine*, 475 U.S. 412, 422 (1986) (holding that defendant's otherwise voluntary confession was not invalidated because police failed to inform him that a public defender was trying to contact him). Since the events they testified to occurred outside of the Defendant's presence, their testimony has no bearing on his knowing waiver.

## CONCLUSION

The evidence presented at the hearing, coupled with the applicable statutory law and case precedent, clearly establish that Defendant was advised of his *Miranda* rights prior to any questioning, that he made a knowing and voluntary waiver of those rights, and that his statement to Rangers Caffey and Kotlowski was otherwise voluntary. Defendant's Motion to Suppress should therefore be denied.

DATED this 18th day of March, 2010.

                CARLIE CHRISTENSEN
                Acting United States Attorney


                */s/ Richard D. McKelvie*
                RICHARD D. McKELVIE
                Assistant United States Attorney

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that I am an employee of the United States Attorney's Office, and that a copy of the foregoing MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS was electronically filed and sent by e-filing to counsel listed below, this 18th day of March 2010.

Matthew M. Cannon
Matthew R. Lewis
RAY QUINNEY & NEBEKER (SLC)
36 S STATE ST STE 1400
PO BOX 45385
SALT LAKE CITY , UT 84145-0385
*Attorneys for David Lacy*

                               /s/ Christine Allred
                               Legal Assistant